|  |  |
|---|---|
| _____ ) | |
| **THE NIPMUC NATION,** ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| **v.** ) | |
| ) | **Civ. Act. No. 14-40013-TSH** |
| ) | |
| ) | |
| **SECRETARY RYAN ZINKE, THE UNITED STATES** ) | |
| **DEPARTMENT OF THE INTERIOR,** ) | |
| **BUREAU OF INDIAN AFFAIRS,** ) | |
| **OFFICE OF FEDERAL ACKNOWLEDGMENT, AND** ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION AND ORDER
### March 30, 2018

**HILLMAN, D.J.**

## Background

The Nipmuc Nation ("Plaintiff", "Nipmuc Nation" or "Petitioner 69A"), has filed a

Petition for Review of a final administrative determination by Secretary Ryan Zinke, The United

States Department of the Interior ("DOI")[1], Bureau of Indian Affairs ("BIA"), Office of Federal

---

[1] Ryan Zinke became Secretary of the DOI on March 1, 2017, replacing Sally Jewell, Secretary of the DOI at the time the suit was filed. _See_ Fed. R. Civ. P. 25(d).

Acknowledgment, and the United States of America (collectively, the "Defendants")[2]. Plaintiff

seeks a ruling that the Defendants' Final Determination against federal acknowledgment was

arbitrary, capricious, and abuse of discretion, against the substantial evidence and not in

accordance with the law (Count One); that the BIA failed to follow the applicable regulations set

forth in 25 C.F.R. §83 *et seq.* and therefore, the Defendants' Final Determination against federal

acknowledgment violated Plaintiff's procedural due process rights (Count Two); and that the

BIA's refusal to consider evidence in support of Plaintiff's Petition, despite its consideration of

such evidence in the applications of other similarly situated tribes seeking federal

acknowledgment, deprived Plaintiff of its right to equal protection under the law (Count Three).

Essentially, Plaintiffs seeks a declaration that it has satisfied the legal criteria for federal

acknowledgment as an Indian tribe under the laws of the United States of America.

Accordingly, Plaintiff asks this Court to vacate Defendants' Final Determination against federal

acknowledgment and reverse it, or, alternatively, to vacate the Final Determination and remand

Plaintiff's Petition to Defendants with instructions to reconsider the Petition consistent with the

findings of this Court. This Memorandum of Decision and Order addresses Plaintiff's motion for

summary judgment (Docket No. 33), and Federal Defendants' Motion for Summary Judgment

(Docket No. 40). For the reasons set forth below, the Plaintiff's motion is *denied*, and the

Defendant's motion is *granted.*

## **Standard of Review**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that there is no

---

[2] For ease of reference, like the parties, I have for the most part referred to the "Defendants" throughout the opinion rather than referring to the agency or the agency head responsible for any given action or decision.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'" *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

Where the court is asked to review a decision by the DOI to grant or deny a petitioner's request for federal acknowledgement:

[s]ummary judgment 'is an appropriate procedure … and, because th[e] case 'involves a challenge to a final administrative action, the Court's review is limited to the administrative record.'

'The APA entitles a person suffering legal wrong because of agency action,' or adversely affected or aggrieved by agency action to 'judicial review thereof.' The APA requires the reviewing court to set aside an agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' In conducting this review, considerable deference must generally be accorded to the agency. Specifically … the [DOI] has 'special expertise' in determining whether petitioning Indian tribes are entitled to tribal recognition, and thus, the Court must be particularly deferential to its determinations. Accordingly, '[t]here is a presumption in favor of the validity of the administrative action'.

Despite the presumption of validity and the deference that must be afforded to an agency's actions, a reviewing court 'must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' At a minimum, the agency must have considered relevant data and articulated an explanation establishing a 'rational connection between the facts found and the choice made.'

[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

As noted, the 'requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.' This requirement is not particularly demanding, however. Nothing more than a 'brief statement' is necessary, so long as the agency explains 'why it chose to do what it did.' Thus, if the court can 'reasonably ... discern[ ]' the agency's path, it will uphold the agency's decision.

*Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170, 174 (D.D.C. 2011), *aff'd*, 708 F.3d 209

(D.C. Cir. 2013)(internal citations and citations to quoted authorities omitted)(alterations in

original).

## Facts[3]

### History of Native American's in Southern New England

The history of southern New England Indians in central Massachusetts, Rhode Island and Connecticut dates back to approximately 10,000 B.C. These Indians spoke the closely related languages of the Eastern Algonquian family, including Nipmuc, Wampanoag-Massachusetts, Narragansett-Niantic, Mohegan and Pequot, and formed tribes that consisted of several local communities. By the 16th century, southern New England Indians had developed an agricultural economy that required smaller land bases and a more sophisticated political system, consisting of tribal and community leaders, called sachems, and representative councils. Historically, Nipmuc Indians lived in small groups around Massachusetts, Rhode Island and Connecticut.

Contact between Europeans and Nipmuc Indians began in the early 1600s with the colonization of southern New England. In the 1640s, English colonists established twelve

---

[3] Plaintiff included multiple affidavits in support of it contention that the Defendants' determination must be reversed that are not part of the administrative record. In fact, they were prepared well after the FD (as hereafter defined) was made.

> Generally, the reviewing court is limited to the administrative record. When asking for judicial notice of documents in a case where the court is reviewing an agency action, the requesting party must meet one of four exceptions:

>> (1) admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*California Valley Miwok Tribe v. Zinke*, No. CV21601345WBSCKD, 2017 WL 2379945, at *4 (E.D. Cal. June 1, 2017).

While I denied the Defendants' motion to strike the affidavits from the record, I do not find that Plaintiff has established that any of the exceptions apply. Therefore, while I have included some of the facts contained in these affidavits to flesh out some of the historical background, I have not considered them for purposes of determining whether the Defendants' FD was arbitrary or capricious. That determination shall be based solely on the administrative record.

Nipmuc "praying towns" and attempted to convert the Nipmuc to Christianity. Among the praying towns were Hassanamisco (now Grafton, Massachusetts) and Chaubunagungamaug (now Dudley and Webster, Massachusetts). In the 17th century, English colonization of southern New England devastated the Nipmuc and other tribes of the region by spreading diseases for which they had no immunity, and warfare at levels they had not previously experienced. As numbers of English colonists continued to grow, southern New England Indians adopted various strategies for survival, including conversion to Christianity, adoption of English trade practices, goods and culture, and joining the English armed forces in fights against other Indians (with the hope that their cooperation would improve relationships). Southern New England Indians also gave into English pressures to sell their land, which resulted in fragmented tribal lands whereby Indians could not visit one another without trespassing on English land. Tensions between Indians and English escalated to the point of war – the hard-fought, bloody King Philip's War (1675-76). As a result of the war, 40% of the southern New England Indian population was killed. After the war, only a small number of Nipmuc remained in Massachusetts.

After the war, southern New England Indians were sold as slaves and sent to work either in the West Indies or in English households, alongside African slaves. During the 18th century and through to the 20th century, the population of English colonists rose because of high birth rates and economic advantages, while southern New England Indians declined with disease and extreme poverty. Indians continued to face significant challenges to surviving in New England, such as land loss, including losses through fraud committed by colonial officials, guardians and English neighbors. In 1727, Massachusetts allowed white settlers to purchase 7,500 of the 8,000 acres of Hassanamisco lands, and the remaining 500 acres were divided among seven Indian

families that resided there. These families were referred to by the Hassanamisco as "proprietary families." The Cisco family, one of the families in Petitioner 69A, owns 2.5 acres of this land, which is currently referred to by Petitioner 69A as the "Hassanamisco reservation."

The perception of being "Indian" also became diluted as a result of two interrelated external forces. The first is the intermixture of Indians and Africans forming families together. Indians interacted with Africans largely because they were enslaved together in English households.  The second force is Indian residential mobility. English colonists encroached on Indian land reserves, poached timber and other resources, thus reducing the value Indians could extract from their lands.  Other Indians were forced to sell their lands to pay off debts.  As a result, southern New England Indians were forced to seek economic opportunities in towns and cities, far away from their traditional homelands. Thus, Indians joined Africans and poor white laborers in the cities.

European officials were able to distinguish Indians as "Indians" until well after the American Revolution. However, by 1800, "Indians" began to disappear from official records; individuals once designated as "Indian," were now designated as "mustee" or "Negroes" or "coloured."  By 1800, European officials regarded all southern New England Indians as "black," thereby drawing distinct lines between themselves and all persons of color.

In the mid-1800s, Massachusetts commissioned a report to determine which Indians were within the state, which tribes they were associated with, and where they were. This report, called the Earle Report ("Earle Report") included separate listings for families associated with, *inter alia*, the "Hassanamisco Tribe," the "Dudley Indians" and a separate listing of "Miscellaneous." The major components or families who make up the vast majority of Petitioner 69A were not

associated with the Hassanamisco in this state-report. Rather, they were associated with the "Dudley Indians" and "Miscellaneous" categories.

In the 20th century, tribal entities in southern New England bound themselves together in pan-Indian organizations, such as the Indian Council of New England, founded in 1923, in an effort to increase their visibility, preserve and strengthen their traditions, promote intertribal cooperation, and more broadly establish their relationships with American Indians in general. The tribes also gradually became more visible to state and local governments as a distinct political constituency. This led, for example, to formal recognition of the Nipmuc Nation by the Commonwealth of Massachusetts in 1976 in an executive order issued by Governor Dukakis, recognizing that the Tribal Council of Nipmuc was the governing body of the Nipmuc Tribe and ordering state agencies to "deal with . . . the Hassanamisco Nipmuc Tribal Council on matters affecting the Nipmuc Tribe."

The Nipmuc Nation currently includes members of documented descent from historic Nipmuc people. A substantial portion of the Nipmuc Nation continues to live in the same geographic area of Central Massachusetts and parts of Rhode Island and Connecticut. Members continue to gather formally and informally, vote in tribal elections, marry other members of the Nipmuc Nation, and participate in annual pow-wows and other tribal events.

<u>The Case's Procedural Traverse</u>

On or about April 16, 1980, Zara CiscoeBrough, on behalf of "Nipmuc Tribal Council, Hassanamisco reservation, Grafton, Massachusetts," filed a letter of intent declaring an intent to file a petition with the BIA seeking recognition as an American Indian tribe. In 1984, Plaintiff, through "The Nipmuc Nation Trial Council Federal Recognition Committee," submitted a

petition to the DOI, describing itself as descendants from two bands, the Hassanamisco and Chaubunagungamaug. Plaintiff was originally identified within the BIA as Petitioner 69. The DOI identified deficiencies in the petition in 1985 and 1988. Plaintiff indicated to DOI that the petition was complete in 1995 and active consideration began at that time. In 1996, the Chaubunagungamaug Band of the Nipmuc Nation filed a separate letter of intent to petition for federal acknowledgment of the "Webster/Dudley Band of Chaubunagungamaug Nipmuck Indians." In other words, the Chaubunagungamaug Band withdrew from the request for tribal recognition as part of the Nipmuc Nation and instead, sought its own tribal recognition. The BIA accepted the withdrawal and separated Petitioner 69 into two separate petitioners: the Nipmuc Nation was designated Petitioner 69A and the Chaubunagungamaug Band was designated Petitioner 69B.

Defendants evaluated Plaintiff's (Petitioner 69A's) petition for federal acknowledgment under 25 C.F.R. Part 83 (1994). On January 19, 2001, acting Assistant Secretary-Indian Affairs ("AS-IA") Michael Anderson signed and issued a Proposed Finding in favor of acknowledgment for the Nipmuc Nation. The Proposed Finding in favor of acknowledgment was not published in the Federal Register, as required by applicable regulations. On September 25, 2001, AS-IA Neal A. McCaleb signed and issued a 219 page Proposed Finding against acknowledgment for the Nipmuc Nation (the "PF"). The PF was issued without notice to the Plaintiff and without any additional information or evidence than was before the DOI when AS-IA Michael Anderson signed and issued the unpublished Proposed Finding in favor of acknowledgment.

On October 1, 2001, the PF against acknowledgment was published in the Federal Register. On January 23, 2002, a formal technical assistance meeting took place, with

representatives of the Nipmuc Nation, the BIA and other third parties present. The stated purpose of technical assistance was for assistance to petitioners and "to ensure that the petitioner presents the strongest case possible and is not turned down for technical reasons." During the January 23, 2002 formal technical assistance meeting, the Nipmuc Nation inquired as to the status of requests for further technical assistance. The BIA indicated that the request for further technical assistance was a matter of scheduling. The Nipmuc Nation inquired as to further field research visits. The BIA said "[q]uite frankly, I don't think so." The Nipmuc Nation asked whether the BIA was going to bring on an anthropologist to evaluate its response. The BIA answered affirmatively and did not deny that this person would be someone "who hasn't made any field visits to the petitioner." No further technical assistance of any kind, formal or informal, interviews or field research visits were conducted after the January 23, 2002 formal technical assistance meeting.

On June 18, 2004, Principal Deputy AS-IA Aurene Martin issued the Final Determination against Federal Acknowledgment of the Nipmuc Nation ("FD"). Like the PF, the FD determined that the Nipmuc Nation did not meet four of the seven mandatory criteria for acknowledgement under 25 CFR §§83.7(a)-(f). More specifically, the FD found that Nipmuc Nation failed to meet the following criteria: § 83. 7(a)( the petitioning group has been identified as an American Indian entity on a substantially continuous basis since 1900); §83.7(b)(a predominate portion of the petitioning group comprises a distinct community from historical time until present); §83.7(c)(the petitioning group has maintained tribal political influence or authority over its members as an autonomous entity throughout history); and §83.7(e)(the petitioning group's

membership consists of individuals who descend from historical tribes which combined and

functioned as a single autonomous entity).

This FD evaluated evidence in the record under the mandatory criteria identified above in three different ways, based on the petitioner Nipmuc Nation's own self-identifications, to determine if it was a continuation of a historical Indian tribe. The three ways were (1) as those associated with the Hassanamisco reservation (Grafton), (2) as a joint organization encompassing both the Grafton and Webster/Dudley reservations, and (3) as an umbrella organization of the descendants of all historic Nipmuc bands.

The specific findings regarding those criteria which Defendants found Plaintiff failed to

meet are are summarized below.

1. <u>25 C.F.R. § 83.7(a)</u> The first criterion requires the petitioning entity to have been continuously identified as an Indian entity. The DOI concluded that there was insufficient evidence in the record to show that Petitioner 69A had continuously been identified as an Indian entity. Only two percent of petitioner's five hundred twenty six members demonstrated Hassanamisco ancestry. Thus, the FD concluded that references to the Cisco family property (or Hassanamisco reservation) and those associated with it are not
identifications of the petitioner – it was a substantially different group.  Further, the occasional references to Dudley/Webster Nipmuc descendants with Hassanamisco did not identify "an entity" as required for criterion 83.7(a), but occurred in the context of pan-Indian activities in New England. Thus, the evidence in the record was insufficient to demonstrate external identification of the Petitioner 69 as an American Indian entity on a substantially continuous basis since 1900.

2. <u>25 C.F.R. §83.7(b)</u>. The analysis of second criterion, which requires that a predominate portion of the petitioner comprise a distinct community from historical times until present, found some evidence of community among some Hassanamisco descendants from 1785 to 1900, but did not find a community comprised of ancestors of the petitioner. Further, although one family line associated with Dudley/Webster had some ties to some Hassanamisco descendants around Worcester, Massachusetts, that was not a community comprised of petitioner's ancestors and in any event, those ties ceased in the 1950s. The evidence does not show interaction from 1900 to 1953 between the Hassanamisco descendants. . . and the ancestors of most of the Dudley/Webster or Curliss/Vickers descendants who comprise most of the petitioner's current membership."  Further, the DOI found that the examples of "informal social interaction and social relationships among the present

membership … did not provide evidence for community for [the petitioner] as a whole."

   3. <u>25 C.F.R. §83.7(c)</u>.   The third criterion requires the petitioner to demonstrate exercise of political authority over its members. The DOI did not find that a group comprised of ancestors of the petitioner "existed in any definable sense." There was no indication of a political relationship among the "proprietary descendants, much less with the larger group of Dudley/Webster and Curliss/Vickers descendants antecedent to … most of the petitioner's membership." In more recent times, "there is little data in the record to show a connection between the council and the general membership of the Hassanamisco or Nipmuc Nation organizations … There was only limited evidence that the issues dealt with by the Hassanamisco council were of importance to the members." The limited evidence that conflict over issues was of concern to the membership or that interest in them was widespread was insufficient to demonstrate satisfaction of this criterion.

   4. <u>25 C.F.R. §83.7(e)</u>. The fifth criterion requires that a petitioner demonstrate descent from a historic tribe. The Plaintiff defined the historic tribe its members descend from as "those individual and families of Nipmuc and other Indian ancestry who were part of the Hassanamisco tribal community by the 1920[s]." The DOI did not find a 1920s community as argued by petitioner Nipmuc Nation, nor did The DOI find a historical Indian tribe comprised of the Hassanamisco, Dudley and Miscellaneous Indians as identified in primary sources such as the Earle Report. There was no evidence in the record that persons listed in the 1861 "Miscellaneous category" were a tribe, nor evidence that persons on these lists, or their descendants, coalesced as a historical Indian tribe. Therefore, in calculating descent for purposes of this criterion, The DOI kept the groups separate as together they were not a historical Indian tribe. The DOI found only two percent of petitioner's members descend from the Hassanamisco list from 1861, and only fifty-three percent from the Dudley list in 1861. Thirty-four percent descend from the Miscellaneous list. Therefore, the petitioner's membership did not descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity.

On June 25, 2004, the FD was published in the Federal Register. A panel of

administrative law judges within the DOI affirmed the FD on September 4, 2007.  The panel of

administrative law judges referred certain identified issues for consideration by the Secretary of

the Interior. On January 28, 2008, the Nipmuc Nation was advised that the Secretary declined to exercise his discretion to direct additional reconsideration by the Assistant Secretary.

## Discussion

In 1978, the DOI promulgated regulations establishing a uniform procedure for "acknowledging" American Indian Tribes. *See* 25 C.F.R. § 83.1 *et seq.* The DOI adopted comprehensive regulations that govern its decisions concerning tribal status as set out in 25 C.F.R. Part 83 (the "acknowledgment regulations"), which established procedures by which the DOI acknowledges that certain Indian groups exist as "tribes." *Id.* § 83.2 Recognition "is intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present." *Id.* § 83.3(a). The DOI, through the BIA applies its expertise to this determination. *Robinson v. Salazar*, 838 F. Supp.2d 1006, 1029 (E.D. Cal. 2012). A group such as Nipmuc Nation seeking recognition as a tribe entitled to "acknowledgment" must satisfy seven criteria:

> (a) the group has been identified from historical times to the present, on a substantially continuous basis, as Indian; (b) 'a substantial portion of the ... group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and ... its members are descendants of an Indian tribe which historically inhabited a specific area'; (c) the group 'has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present'; (d) the group has a governing document; (e) the group has lists of members demonstrating their descent from a tribe that existed historically; (f) most of the members are not members of any other Indian tribe; (g) the group's status as a tribe is not precluded by congressional legislation.

25 C.F.R. § 83.7.

> A petitioner … is not required to provide conclusive evidence under each of the Part 83 criteria; rather, a 'criterion shall be considered met if the available evidence establishes a reasonable likelihood of the validity of the facts relating to that criterion.' Furthermore, the Department in evaluating a petition, is required to 'take into account historical situations and time periods for which evidence is

demonstrably limited or not available.' After evaluating all of the evidence proffered by a petitioner, should the Department conclude that the evidence 'demonstrates that it does not meet one or more criteria,' or if 'there is insufficient evidence that it meets one or more of the criteria,' then the Agency 'may' deny acknowledgment to a petitioner.

*Muwekma Ohlone Tribe*, 813 F. Supp. 2d at 174.

As required, Nipmuc Nation applied for acknowledgment by filing a "documented petition" which contained explanations and supporting documentation it contended demonstrated that it meets these seven mandatory criteria. A petition is reviewed in accordance with the procedural requirements set forth in the acknowledgement regulations, as summarized below.

Upon receipt of a documented petition under the regulations, the Assistant Secretary-Indian Affairs ("AS-IA") reviews the petition and its supporting documentation and provides technical assistance regarding additional research needed to support the petitioner's claims. Interested parties, such as the relevant state governors and attorneys general, are provided notice of the petition and the opportunity to become active participants in the process, along with other third parties, such as local governments, other federally recognized Indian tribes, and other non-recognized Indian groups that might be affected by an acknowledgment determination.

Once AS-IA determines that the documentation in the petition is adequate to permit a full review, the petition is considered 'ready' for a full evaluation by the AS-IA and is placed on the 'Ready, Waiting for Active Consideration' list (the "ready list"). The acknowledgment regulations specify that '[t]he order of consideration of documented petitions shall be determined by the date of the Bureau's notification to the petitioner that it considers that the documented petition is ready to be placed on active consideration.'

The actual evaluation of the petition and its evidence under the regulatory criteria by the agency professional staff occurs during 'active consideration.' During active consideration, the AS-IA continues the review *and publishes proposed findings in the Federal Register*. The proposed findings are preliminary decisions as to whether the petitioning group meets the regulatory criteria based on the documentation before the agency at the time.

After issuance of notice in the Federal Register of the proposed findings, there is a public comment period of 180 days, with extensions granted for good cause. During this time period, the AS-IA provides informal and formal technical assistance, and petitioners and third parties may submit additional arguments and

evidence in support of, or in opposition to, the proposed findings. Following the close of the public comment period, the petitioner has a reply period, during which it responds to comments submitted during the public comment period.

Following consultation, the final phase of active consideration begins. The OFA professional staff evaluates the evidence in the record, prepares a summary of the evidence under the regulatory criteria and recommends to the AS-IA whether the petitioner meets the criteria. The AS-IA then issues a final determination on the status of the petitioner. This determination is not deemed to be a final and effective agency action, however, unless a period of 90 days passes without the filing of a request for reconsideration with the Interior Board of Indian Appeals ("IBIA"). If there is a request for reconsideration before the IBIA, the IBIA may affirm or vacate the final determination, or refer issues to the Secretary of the Interior (the "Secretary") for further response or evaluation.

*Shinnecock Indian Nation v. Kempthorne,* No. 06-CV-5013 JFB ARL, 2008 WL 4455599, at *5

(E.D.N.Y. Sept. 30, 2008)(emphasis added)(internal citations omitted).

The Nipmuc Nation asserts that in reaching the FD, the Defendants either did not follow this process, or did not act in accordance with the regulations. More specifically, it alleges that the Defendants: (1) acted arbitrarily and capriciously, and have abused their discretion, by wrongfully defining who is and who is not a member of the Nipmuc Nation and then finding that Nipmuc Nation's evidence did not satisfy its manufactured definition; (2) abused their discretion and violated due process when they failed to provide assistance in the technical assistance meeting by affirming facts in that meeting that it rejected in the FD and did not respond to Nipmuc Nation's requests for further assistance; (3) abused their discretion and violated due process when Defendants, without legal authority or any additional evidence, reversed its preliminary positive finding for acknowledgment and issued a preliminary negative finding; and (4) failed to apply federal law and regulations as to Nipmuc Nation in the same or similar manner that it has applied such laws and regulations to other petitioning tribes.

<u>Whether the Defendants' Finding that Plaintiff Failed to Satisfy Four of the Requisite Criteria</u>
<u>was Arbitrary and Capricious</u>

*<u>Whether the Defendants Improperly Defined the Nipmuc Nation</u>*

The Nipmuc Nation, which for purposes of the immediate discussion I will refer to either

as Plaintiff or Petitioner 69A, asserts that the Defendants usurped its right to define for itself the

entity on behalf of which it sought federal acknowledgment as an Indian tribe. Instead, it argues,

the Defendants imposed their own definition of the "Nipmuc Nation" and found that Petitioner

69A failed to meet the acknowledgement criteria based on that definition. More specifically, in

its letter of intent, Plaintiff initially identified the Nipmuc Tribal Council, "an elected body

which acts on behalf of the Nipmuc Indian people" which would be seeking to petition the BIA

for recognition as an American Indian tribe. The Nipmuc Tribal Council provided the following

address information for the elected body: "Hassanamisco Reservation, Grafton, Massachusetts."[4]

As the governing body of the Nipmuc Indian people, the Nipmuc Tribal Council signed this

letter of intent, as required by applicable regulations. *See* 25 C.F.R. § 83.4(c) (1994) ("A letter

of intent must be produced, dated and signed by the governing body of an Indian group ….").

Plaintiff takes the position that the petitioning entity was "the Nipmuc Indian people," on whose

behalf the Nipmuc Tribal Council filed its letter of intent. According to Plaintiff, Defendants,

fixated on the address of the petitioner entity's tribal council (The Nipmuc Tribal Council),

which referenced the "Hassanamisco Reservation," and "conflated" that with the definition of

---

[4] I will note that Plaintiff's letter of intent is not a model of clarity. While it mentions that the Nipmuc Tribal Council acts on behalf of the Nipmuc Indian tribe, the letter formerly states that "[o]n behalf of the Nipmuc Tribal Council, Hassanamisco Reservation, Grafton, Massachusetts, *we* wish to give notice of *our* intention to file a Petition with the Bureau of Indian Affairs seeking recognition as an American Indian tribe." (emphasis added). Given the context and the place where the phrase appears in the letter of intent, the suggestion that the reference to "Hassanamisco Reservation, Grafton, MA" is meant only to convey the address of the tribal council seems disingenuous.

the petitioner. Defendants thereby ignored Plaintiff's definition of itself and imposed an identity tied only to the Hassanamisco Band of the Nipmuc Nation. That is, when analyzing the Petition, Defendants limited Petitioner 69A to only the Hassanamisco Band.[5]

Plaintiff alleges that it repeatedly attempted to correct what it saw to be a misconception by the Defendants regarding the identity of the petitioning entity. On numerous occasions, Plaintiff, through the Nipmuc Tribal Council, apprised the Defendants that Petitioner 69A represented all members of Nipmuc Nation, including not only the Hassanamisco Band, but also members from Dudley-Webster, Natick, and Quinsigamond in Massachusetts, and members of various Connecticut bands. Plaintiff contends that Defendants failure to acknowledge a broader definition of who constituted Petitioner 69A led to crucial errors in their analysis and resulted in the Defendants determining that they failed to meet four of the required criterion. However, based on the record before me, which includes the Plaintiff's letter of intent and Petition, I cannot find that the Defendants improperly defined the group that comprised "Petitioner 69A.[6]

---

[5] Plaintiff contends that at least as early as November 1, 1996, Defendants' historian, Virginia E. DeMarce, Ph.D., refused to acknowledge that Petitioner 69A was the Nipmuc Nation comprised of people with Nipmuc heritage, as stated in the Constitution of the Nipmuc Nation. She hand-wrote notes on the Constitution that state as follows: "This is not the same group that filed the original letter of intent to petition." Dr. DeMarce reiterated "this problem" two months later in a January 10, 1997 memorandum to Holly Reckord, Chief, Acknowledgment and Research, in which she stated that "[P]etitioner 69A is not now defining itself as what the Hassanamisco Band was under Zara CiscoeBrough when the petition was filed…I adverted to this problem in an earlier memo to you…" Essentially, Plaintiff contends that the BIA took the position that Plaintiff's original letter of intent was filed on behalf of the "Hassanamisco Reservation" or "Hassanamisco Nipmuc." It is the Plaintiff's position that in the petition, it identified itself as the "Nipmuc Nation." However, while Plaintiff criticizes Defendants as having applied a rigid and narrow definition of who is the "Nipmuc Nation", it is clear from the administrative record that the Plaintiff's own definition of who constitutes the "Nipmuc Nation," has remained in a state of fluidity throughout the proceedings.

[6] As will become evident in my discussion of each of the four failed criterion, the Defendants have correctly pointed out that it is irrelevant how the Defendants defined Petitioner 69A because there is no evidence *in the administrative record* that the "Nipmuc Nation," as defined by the Plaintiff functioned together as a group, or that the Indian ancestors of those that Plaintiff designates as member of "Nipmuc Nation,' existed as a historical tribe, exercised political control, constituted a community or were historically identified as an Indian entity.

With that background, I will review the Defendants' findings as to each of the four failed criterion to determine whether their decision was arbitrary or capricious.

### *Whether Defendants' Determination that Plaintiff failed to meet the Section 83.7(a) Criterion Arbitrary and Capricious*

Plaintiff further argues that once the Defendants identified it (*i.e.,* Petitioner 69A) as Hassanamisco, the inquiry was over for purposes of Section 83.7(a) because the Hassanamisco identifications confirmed that it (the petitioning entity) was Indian. However, according to Plaintiff, Defendants placed a higher burden of proof on it by requiring it to "show what precise entity was being identified," and found against Plaintiff when it could not establish that "the Hassanamisco evidence identified 'the antecedents of the petitioner as it now defines itself.'" Plaintiff argues that Defendants' decision was arbitrary and capricious because they held it to a more burdensome standard than required by the regulations or their own interpretation of the regulations.

Pursuant to Section 83.7(a), a petitioner demonstrate it has been identified by *external* sources as an American Indian entity on a substantially continuous basis since 1900. To satisfy the criterion, an identification: (1) must be of the petitioner; (2) must be of an entity; (3) the entity must be described as American Indian; and (4) the identifications must be on a substantially continuous basis. Additionally, the regulation requires that the identification be "by other than the petitioner itself or its members." 25 C.F.R. §83.7(a). Following is a summary of Defendants' findings. [7]

---

[7] Defendants' memorandum provides a detailed and comprehensive summarization of the Defendants' findings on each of the four failed criterion. For the sake of brevity, I have included only a more succinct summary taken from the Notice of FD published in the Federal Register. Additional factual findings made in the FD are included are as necessary to the discussion of the issues raised by the parties.

In determining that the Plaintiff did not meet this criterion, the Defendants concluded that the evidence in the record "does not include continuous external identifications of a Hassanamisco Nipmuc entity broader than the Hassanamisco proprietary descendants for the period 1900-1979." That is, the seven Indian families to whom the Hassanamisco lands were transferred in 1727. The Defendants found that an external identification of this Hassanamisco entity does not equate to an identification of Petitioner 69A because the Hassanamisco descendants constitute only 11 of Petitioner 69A's members. Moreover, the Defendants found that from 1900 through 1979, the majority of the external identifications only referred to the Sisco family property which constitutes the Hassanamisco Reservation and some of its residences, while other external identifiers referred to named descendants of other Hassanamisco proprietary families. However, other than the Sisco family none of these families were members of Petitioner 69A. Defendants further found that there were external identifications of occasional associations of Dudley/Webster Nipmuc descendants with Hassanamisco during the relevant period, however, such associations "occurred primarily in the context of pan-Indian activities in New England rather than being identifications of an Indian entity which is antecedent" to Petitioner 69A. In their FD, Defendants found that the evidence established that external identifications of an entity comprised of various Indian groups who are members of Petitioner 69A existed only from the mid-1970s to the present. The FD concluded that the ancestors of the large majority of Petitioner 69A's members were not part of the Hassanamisco entity which external observers identified during the relevant period, and were not separately identified as an Indian entity. Defendants, therefore, concluded that Petitioner 69A did not meet the requirements of criterion Section 83.7(a).

19

First, I find that the Defendants properly applied the regulation and did not impose a higher burden of proof on it than was required. The Defendants found that only 2 % of the membership of Petitioner 69A shared an external identification and that this was insufficient to support a finding that the petitioning entity, *as a whole*, shared the external identification. I agree with Defendants that the evidence in the record supports their conclusion that that Plaintiff, *as it defined itself, from time to time,* was not *externally* identified as an Indian entity. Therefore, I find that the Defendants' conclusion regarding this criterion was not arbitrary or capricious.

*Whether Defendants' Determination that Plaintiff failed to meet the Section 83.7(b) Criterion Arbitrary and Capricious*

Section 83.7(b) requires that a predominate portion of the petitioning group be comprised of a distinct community from historical time until present. Plaintiff asserts that Defendants' decision denying that it met this criterion was arbitrary and capricious because their "Hassanamisco-centric focus" caused them to exclude evidence relating to non-Hassanamisco Nipmuc which would have supported a finding of the existence of a distinct community during the relevant period.  More specifically, Plaintiff contends that the Defendants did not consider the off-reservation Nipmuc families and Wabbaquassett and Hatchet Pond communities after initially agreeing that they would be considered Nipmuc communities.

Under the regulations, a combination of evidence which may satisfy this criterion includes: significant rates of marriage within the group, significant social relationships connecting individual members, and significant rates of informal social interaction broadly among the members of the group. 25 CFR § 83.7(b)(1). Additionally, the petitioner may demonstrate community by establishing  that 50% of the members reside in a geographic concentration within an area exclusively or almost exclusively composed of members of the

group, or 50% of the members maintain distinct cultural patterns, such as language, or kinship organization. 25 C.F.R. § 83.7(b)(2). The FD sets forth a comprehensive analysis as to why the Defendants found that Plaintiff failed to satisfy this criterion, which is summarized as follows.

The evidence established a limited community of some of the descendants of the original Hassanamisco proprietary families from 1785-1869 and from 1869 through the early 1950s. The FD goes on to outline some tenuous and limited ties between the original Hassanamisco proprietary families. However, the contacts were intermittent and the focal point of the community was in Worcester, Massachusetts, not the Hassanamisco Reservation in Grafton (although the reservation remained an important symbol). The Defendants found that the record evidence showed that most of Petitioner 69A's ancestors were not associated with the Hassanamisco descendants focused in the Worcester area, nor were they documented to be interacting with each other elsewhere. The Defendants summarized other interactions/associations between members of Petitioner 69A and found that they either took place only in the context of pan-Indian organizations (rather than a community context), are not documented to have associated with Hassanamisco by the 1920s (and in fact, did not have significant interaction until the 1960s and 1970s), and the continuous contact between the "attenuated" Worcester based community and the Hassanamisco ceased to exist in the 1950s. Thereafter, the descendants of the Worcester based community did not become part of Petitioner 69A until it greatly expanded its membership in the 1990s. Ultimately, the Defendants concluded that of the original Hassanamisco proprietary families, the only one that has continued to function continuously within Petitioner 69A and its immediate antecedents since the 1950 is the Sisco family itself, which comprises 11 of Petitioner 69A's 526 members. Descendants of

other proprietary families (the Gigger line and two other Hassanamisco lines, the Scott and Hemenway families) joined the member ship list of Petitioner 69A in 1996-97. However, they were dropped from the membership list in 2002 when it was revised downward by Petitioner 69A after it conducted research and considered evidence demonstrating social ties and ancestry from specific family lines.[8] The FD concluded that Petitioner 69A, as defined by its reduced 2002 membership list, does not demonstrate sufficient social ties to meet Section 83.7(b)'s requirements: "The evidence in the record does not substantiate the petitioner's claims of distinct, shared cultural traditions within the membership".

Plaintiff does not challenge the Defendants' specific findings. Instead, Plaintiff asserts that Defendants' decision was arbitrary and capricious because they failed to consider evidence of the off-reservation Nipmuc families and Wabbaquasset after initially agreeing (in the technical assistance meeting) that they would be considered Nipmuc communities. Plaintiff also contends that Defendants decision was arbitrary and capricious because in the FD, they required Plaintiff to provide actual interaction between specific individuals *and* disregarded positive evidence of interactions, which although they may have been thin or distant, established connections which would support a finding of community. Plaintiff further contend that Defendants disregarded prior precedent and provided no intelligible analysis for doing so.

Defendants point out that while not expressly stating that they were considering the Wabbaquasset, the FD refers to off-reservation Nipmuc families. Moreover, even if the Defendants did not consider these other families, Plaintiff does not specify how consideration of

---

[8] Petitioner 69A reduced its membership list in response to the conclusion in the PF that, as constituted based on the 1997 membership list, it did not exist as a community within the meaning of Section 83.7(b).

them would have altered the Defendants' analysis. I do not find that Defendants have ignored prior precedent, rather, the Defendants cited precedent more relevant to this case.

Plaintiff makes a further argument that the Defendants' decision was arbitrary and capricious because they failed to provide it with the necessary assistance at the technical assistance meeting and/or misled it regarding what additional evidence would be necessary to satisfy this criterion. Leaving aside this contention, which I will discuss later in this opinion, I cannot find that the Defendants' decision, based on the record evidence, was arbitrary or capricious.

### *Whether Defendants' Determination that Plaintiff failed to meet the Section 83.7(c) Criterion Arbitrary and Capricious*

Section 83.7(c) requires that the petitioning group establish that it has maintained tribal political influence or authority over its members as an autonomous entity throughout history. The regulation lists the following factors:

(1) This criterion may be demonstrated by some combination of the evidence listed below and/or by other evidence that the petitioner meets the definition of political influence or authority in § 83.1.

(i) The group is able to mobilize significant numbers of members and significant resources from its members for group purposes.

(ii) Most of the membership considers issues acted upon or actions taken by group leaders or governing bodies to be of importance.

(iii) There is widespread knowledge, communication and involvement in political processes by most of the group's members.

(iv) The group meets the criterion in § 83.7(b) at more than a minimal level.

(v) There are internal conflicts which show controversy over valued group goals, properties, policies, processes and/or decisions.

(2) A petitioning group shall be considered to have provided sufficient evidence to demonstrate the exercise of political influence or authority at a given point in time by demonstrating that group leaders and/or other mechanisms exist or existed which:

> (i) Allocate group resources such as land, residence rights and the like on a consistent basis;

> (ii) Settle disputes between members or subgroups by mediation or other means on a regular basis;

> (iii) Exert strong influence on the behavior of individual members, such as the establishment or maintenance of norms and the enforcement of sanctions to direct or control behavior;

> (iv) Organize or influence economic subsistence activities among the members, including shared or cooperative labor.

25 C.F.R. § 83.7(c). The Defendants findings in support of their conclusion that Plaintiff failed to meet this criterion are summarized below.

"[T]he evidence does not indicate that political influence and authority existed within a Hassanamisco entity between 1785 and 1900 at a level sufficient to meet [this] criterion." More specifically, the community that existed among the Hassanamisco proprietary descendants during the periods from 1785 through 1869 and from 1869 to 1900 was not a sufficiently high level to provide carry-over evidence under this criterion. Additionally, the Defendants found that the major components or families antecedent to Petitioner 69A, *i.e.*, the Dudley/Webster and Curliss/Vickers descendants, were not associated with Hassanamisco when the tribe was identified in the Earl Report in 1861 and have not been shown to have melded with all or part of the Hassanamisco after 1861 and prior to 1900. Therefore, Petitioner 69A does not meet this criterion prior to 1900. From 1900-1961, no Hassanamisco tribal community that included the

majority of ancestors of Petitioner 69A existed in any definable sense. Through the late 1950s, there was a tenuous community of descendants of some of the Hassanamisco proprietary families who maintained a connection with each other and maintained a public identity with the Hassanamisco reservation. The Sisco family held a place of prominence, but did not maintain a "bilateral political relationship" with other proprietary descendants or with the larger group of Dudley/Webster and Curliss/Vickers descendants which are antecedent to most of Petitioner 69A's membership. Most of the political events and activities relied on by Petitioner 69A took place from the 1920s-1950s in the context of pan-Indian organizations in New England and the leaders of these organizations did not exercise political authority or influence over people who were part of the 1920s community, as defined by Petitioner 69A. There is no evidence that ancestors of most members of Petitioner 69A belonged to such organizations, and the majority of the people who were in such organizations do not have descendants in Petitioner 69A, "[t]hus, they did not provide a venue for any bilateral political relationship among leaders and followers antecedent to [P]etitioner 69A." From 1978-1996, there is scant evidence to show a connection between the Hassanamisco council and general membership of the Hassanamisco or Nipmuc Nation organizations, other than limited evidence to show that council members were "family representatives," or that they communicated with other than family members. Annual membership meetings of the Hassanamisco organization were sparsely attended, consisted primarily of council members, and dealt with few issues of importance to the membership. There was no evidence that the fluctuation in membership was politically motivated, *i.e.,* motivated by membership opinion— the reduction in 2002, for example, was in response to negative findings in the PF that the expanded membership did not constitute a community.

Essentially, there was no evidence that the Hassanamisco organization, as constituted before the 1990s expansion, was a community within which political influence was exerted.  In making their determination, the Defendants considered the lack of evidence of the existence of a community, and the fluctuating nature and size of Petitioner 69A's membership which would have allowed the exercise of political activity.  Thus, the FD found there was no community over which Zara CiscoeBrough exercised political influence from 1960s to 1982, nor after her, by the Hassanamisco council until its dissolution in 1996, nor by successor councils over expanded membership between 1990 and 2002, nor the present membership, by the present governing body of Petitioner 69A.  Moreover, much of the evidence about membership opinion, possible political issues, and participation in conflicts from 1990-2002 is irrelevant because it involved members or antecedents which are no longer part of Petitioner 69A. The Defendants also determined that the units which combined into the Nipmuc Nation in 1994 were not communities and did not exercise political influence within their respective memberships, nor was the combined Nipmuc Nation in 1997 a community within which political influence was exercised. There was evidence of conflict and membership opinion from 1990 to 1998 concerning the development of a governing documents  and membership, however, there was no evidence that the relevant leaders involved in this conflict had any followers or represented persons within Petitioner 69A's defined membership.

Plaintiff asserts that the Defendants ignored the listed factors when making its determination.  However, as to the factors set forth in Section 83.7(c)(1)(i)-(v), the regulation states that this "criterion *may* be demonstrated by some combination of the evidence listed below *and/or* by other evidence that the petitioner meets the definition of political influence or

authority". *Id.* Therefore, while informative, these factors are not mandatory. The Defendants' failure to consider all of these factors or to analyze any piece of evidence with respect to any of them does not render the Defendants' decision arbitrary and capricious. Section 83.7(c)(2) provides that "[a] petitioning group *shall* be considered to have provided sufficient evidence to demonstrate the exercise of political influence or authority at a given point in time by demonstrating that group leaders and/or other mechanisms exist or existed which" satisfy four specified factors. The Defendants' comprehensive analyses did consider whether Plaintiff had satisfied any of these factors.

The Plaintiff also argues that the Defendants mischaracterized the evidence presented without properly assessing the factors. One of the primary examples cited by the Plaintiff is the Defendants' alleged failure to properly consider a 1907 letter from Sarah M. Cisco to the President of the United States. The letter is lost, but the response from the Office of Indian Affairs ("OIA") still exists. OIA states that it was responding to Ms. Cisco's letter "concerning the claims to land at Grafton, Massachusetts by descendants of the Hassanamisco Indians." Defendants concluded that the letter had been a personal inquiry, *i.e.*, not on behalf of a group. Plaintiff asserts that this conclusion contradicts the content of the OIA's response that the U.S. Government had never had any relations to Indians who remained in New England or claimed land there. Plaintiff contends that the Defendants failed to evaluate this letter significance with respect to the factors enumerated above. Without the original letter, any characterization of its purpose or contents is pure speculations and therefore, it is unclear to me how the letter can be significant to either parties' position. In any event, even if I assume that the Defendants' interpretation of the letter was incorrect, their failure to properly analyze the letter's significance

would not undermine their findings.  This is true of other instances where the Plaintiff asserts that the Defendants mischaracterized the evidence and failed to reconcile such evidence to the criterion factors. Plaintiff does not directly contradict the Defendants' findings and more importantly, does not explain *how* application of the factors would have changed the Defendants' finding.

Plaintiff also asserts that the Defendants mistreated oral evidence which it presented. More specifically, Plaintiff asserts that it had produced oral evidence of annual fairs, tribal meetings, and "regular business meeting" which occurred approximately every three months among tribal members.  The Defendants gave little weight to such evidence because there was "no minutes, newspaper articles, letters … or other contemporary primary evidence showing their occurrence or indicating who attended them."  But Defendants did consider the evidence. That it ascribed it a lesser weight because there was no contemporaneous corroborating evidence, particularly given the indefinite nature of some of the oral recollections, was not arbitrary or capricious.  Under the circumstances, I cannot find that the Defendants' determination based on the record evidence was arbitrary or capricious.

*Whether Defendants' Determination that Plaintiff failed to meet the Section 83.7(e) Criterion Arbitrary and Capricious*

Section 83.7(e) requires that the petitioning group's membership consists of individuals who descend from historical tribes which combined and functioned as a single autonomous entity.  Generally, the Defendants concluded that there was no amalgam by which two tribes combined and functioned as a single autonomous political entity.   The Defendants findings in the FD are summarized below.

For the FD, Petitioner 69A defined the requisite "historic Nipmuc tribe" as the "individuals and families of Nipmuc and other Indian ancestry who were part of the Hassanamisco tribal community by the 1920s." The community included their ancestors, living in the 1920s, who descended from the Dudley Indians and Miscellaneous Indians identified in the Earle Report, Connecticut Indians, or descended from a few other Indian ancestors living in the 1920s, as well as their ancestors living the in the 1920s who descended from the Hassanamisco Indians identified in the Earle Report. However, the Defendants found that the evidence did not support a finding that that such a coalesced entity existed by the 1920s. Instead, the Defendants found that Dudley/Webster Indians and the Hassanamisco Indians were separate tribes which never combined historically.

The Defendants determined that the evidence demonstrates that 2% of Petitioner 69A's membership (11 of 526) had documented descent from the ancestry of the Arnold/Sisco family that were part of the historical Hassanamisco/Grafton Nipmuc tribe identified in 1861. The evidence further demonstrated that 53% (277 of 526) had documented descent from six families who were identified in 1861 as the Dudley/Webster Indians. Individually, such percentages were insufficient to demonstrate that Petitioner 69A, as a whole, met the requirement's criterion. Indeed, combined the two tribes 55% is insufficient to meet the requirement. The Defendants then found that 34% of Petitioner 69A's members have Indian ancestry from individuals identified as Miscellaneous Indians in the Earle Report, 8% have Indian descent from individuals identified as Connecticut Indians and 3% have other Indian identity. Thus, 45% of Petitioner 69A's members do not have documented ancestry from either the historical Hassanamisco tribe or historical Dudley/Webster tribe. The Defendants concluded, therefore, that Petitioner 69A

had failed to meet the criterion's requirement because it had not demonstrated descent from a single historical tribe or tribes that combined or amalgamated historically.

Plaintiff asserts that the Defendants "conflated" the word "community" as understood in the regulations with the term as used by Petitioner 69A to describe its historical tribe. Consequently, Defendants relied on their conclusions under Sections 83.7(a), 83.7(b) and 83.7 (c) in making their determination that there is no "Hassanamisco tribal community." Plaintiff also asserts that it was inappropriate for the Defendants to rely on the Earle Report to define who is and is not a Hassanamisco or Dudley/Webster given that it was prepared by a non-Indian, and that it assumes the labels "Hassanamisco" and "Dudley/Webster" are the correct labels to be used. This is important given that Plaintiff takes the position that the Hassanamisco and Dudley/Webster tribes as  defined by the Defendants are not the entities on whose behalf Petitioner 69A sought federal acknowledgement. Plaintiff contends that Petitioner 69A originally defined itself as one historical tribe consisting of multiple bands joining together at the Hassanamisco Reservation. Plaintiff asserts that Defendants created two separate and distinct tribes, which triggered the criterion's amalgamation requirement. The Defendants then determined that the two tribes had not amalgamated and therefore, declined to combine together the number of Hassanamisco and Dudley/Webster descendants.  Plaintiff additionally argues that its members who descend from Mary (Curliss) Vickers, one of the "Miscellaneous" Indians the Earle Report found resided in Massachusetts, should be considered Nipmuc descendants to raise the percent of Plaintiff's members who descend from a "historical tribe" to satisfy the 80% requirement. Plaintiff contends that rather than recognize the 177 members as having Nipmuc descent, the Defendants arbitrarily imposed another requirement on Petitioner 69A to establish

tribal relations, which is not required by the regulations. Plaintiff contends that had all combined descendants been properly included, 88.6% of Petitioner 69A's members having documented Nipmuc descent which would have been high enough to satisfy this criterion.

Plaintiff further challenges the Defendants as arbitrary and capricious on the grounds that Defendants mislead Petitioner 69A at the technical assistance meeting, At that meeting Defendants confirmed that in order to meet this criterion, Petitioner 69A would have to establish that at least 80% of its members were descended from a historic Indian tribe— the PF had found that only 54% of Petitioner 69A's members were descended from a historical tribe. After consulting with the Defendants, Petitioner 69A attempted to meet the 80% threshold by culling its membership roll from 1,602 to 526 in order that it would "more accurately reflect the Hassanamisco tribal community as it has developed through time." Although the family lines represented on the reduced membership roll had documented descent from the historical Nipmuc tribe, in the FD, the Defendants found that only 2% of Petitioner 69A's members descended from a historical tribe, *i.e.,* the Hassanamisco Nipmuc tribe. Plaintiff asserts that the fact that the percentage of its members found to have descended from a historic tribe dropped so drastically from the PF to the FD shows that: (1) Defendants did not meet their obligation at the technical assistance meeting to advise Petitioner 69A how it could strengthen its position; and (2) the Defendants changed the definition of Nipmuc Nation between the PF and the FD.

I agree with the Plaintiff that the Defendants' conclusion in the FD that only 2% of the membership roll of Petitioner 69A has documented Nipmuc descent was unforeseen considering that in the PF, the Defendants concluded that 54% of the then membership roll of Petitioner 69A descended from a historic Indian tribe— particularly given that in response to discussions in the

technical assistance meeting, Petitioner 69A culled its membership roll in an attempt to increase the percentage of individuals with documented Nipmuc descent. I am troubled by the Defendants' conclusion that the Hassanamisco and Dudley\Webster were not amalgamated and therefore, would not be considered as a single historic tribe. More troubling is the conclusion that the Curliss/Vickers line of descendants should not be included for purposes of determining whether Petitioner 69A meets this criterion. Nevertheless, in the FD the Defendants provide a detailed analyses regarding the various families (including the Curliss/Vickers' line of descendants), their connections and their affiliations. While this is a much closer call, I cannot find Defendants' decision, based on the evidence, was arbitrary and capricious. At the same time, Plaintiff's primary argument with respect to this criterion focuses on the Defendants' alleged failure to provide technical assistance with respect thererto, as required, under the regulations. I will now address this argument.

### Whether Defendants Failed to Provide Assistance in the Technical Assistance Meeting

I have found that based on the record evidence, the Defendants' finding that Plaintiff failed to meet the Section 83.7(a)-(c) and (e) criterion. However, Plaintiff asserts that because the Defendants failed to provide it with adequate assistance at the technical assistance meeting, mislead it about whether additional evidence was necessary, and/or misled it about whether it had sufficient evidence to satisfy the criterion, the FD was arbitrary and capricious and must be vacated.

The regulations provide that the Defendants, "if requested by the petitioner or any interested party, hold a formal meeting for the purpose of inquiring into the reasoning, analyses, and factual bases for the proposed finding. The proceedings of this meeting shall be on the

record. The meeting record shall be available to any participating party and become part of the record considered by [them] in reaching a final determination." 25 C.F.R. § 83.10. The purpose of such meeting is to ensure that the petitioner presents the strongest case possible for federal acknowledgment. After the PF was issued on September 25, 2001, Plaintiff requested a formal technical assistance meeting, which took place on January 23, 2002. Defendants provided advice as to how Plaintiff could improve and strengthen its petition materials, and Plaintiff relied on that advice. However, Plaintiff has summarized numerous instances where the Defendants did not consider evidence which they suggested would strengthen Plaintiff's petition. In other instances, Defendants expressly or inherently assured Plaintiff that no further evidence was necessary regarding relevant factors, and then in the FD found that there was insufficient evidence to satisfy the criteria. For example, Plaintiff cites the Defendants' confirmation in the technical assistance meeting that since Dianna Curliss was a Nipmuc, that necessarily meant that Mary Vickers was as well. However, in the FD, the Defendants found that Petitioner 69A had not submitted any new evidence which would demonstrate that Mary Vickers was a descendant of either the Webster/Dudley Nipmuc Indians or the Hassanamisco. This factual finding was one of the determining factors in Defendants finding that Plaintiff failed to satisfy Section 83.7(e). Additionally, as to the Section 83.7(b) criterion, Plaintiff included evidence pertaining to the Wabbaquasset families. In the FD, however, Defendants did not explicitly reference the Wabbaquasset (although they made a general reference to off-reservation Nipmuc families), despite having previously confirmed in the technical assistance meeting that the Wabbaquasset represented positive evidence of the Nipmuc community. Additionally, a new anthropologist was brought on to Defendants' team to analyze Plaintiff's supplemental materials. Defendants

also hired new researchers (two of three evaluators) to analyze Plaintiff's petition for the first time. Plaintiff requested additional informal technical assistance, a not-uncommon practice and inquired as to whether there would be any site visits, and was told most likely not. The new researchers made no site visits to the Hassanamisco Reservation (citing budgetary constraints), no additional formal or informal technical assistance meetings were held, no face-to-face interviews with tribal leaders were held, and no visits were made to any tribal gatherings or meetings. Instead, the new personnel's decision on Plaintiff's identity as a federally acknowledged Indian tribe took place without the benefit of personal interaction with members of Petitioner 69A.

Essentially, Plaintiff is arguing that I should find that the Defendants did not provide it with adequate technical assistance and, as a result, it was not able to present, or was discouraged from presenting, substantial evidence which would be important to the success of its petition. I will assume that if I made such a finding, it would follow that Defendants' failure to render adequate assistance to the Plaintiff rendered their finding against federal acknowledgement arbitrary and capricious.[9] The remedy would be to vacate the FD and remand this matter to the DOI to actually provide the Plaintiff with "technical assistance", *i.e.,* give the Plaintiff necessary advice as to how to overcome the deficiencies identified in the PF. The problem with this process is, however, that Plaintiff's argument focuses on the Defendants' alleged failure to provide assistance with respect to only the Section 83.7(b) and 83.7(e) criterion. Accordingly, even if I were to find in Plaintiff's favor on this issue[10], it cannot prevail given that, as I have previously

_____

[9] Although I make this assumption, I note that Plaintiff has not cited any authority to support this proposition.

[10] I note that if I were to find it necessary to address this argument, I am inclined to agree with the Plaintiff that the at the very least, the Defendants provided confusing and conflicting advice regarding the extent to which

found, it cannot establish that the Defendants' decision that it failed to satisfy the Section 83.7(a) and Section 83.7(c) criterion was arbitrary and capricious.

<u>Defendants Reversed the Positive Proposed Finding Without Any Statutory Authority and Without Any New Evidence to Justify Such a Reversal</u>

Plaintiff makes one last argument in support of its contention that Defendants' determination was made in contravention of required regulations and administrative procedures (and therefore, in violation of the Fifth Amendment's guarantee of procedural due process): that Defendants refusal to publish the original positive proposed finding in favor of federal acknowledgment in the Federal Register, as required, and their subsequent reversal of that proposed finding and issuance of the negative proposed finding in the PF (which ultimately resulted in the negative FD) without any additional evidence was arbitrary and capricious,

There is a fundamental problem with Plaintiff's argument—I do not find that the positive proposed finding was a binding, official statement by the DOI. Instead, I agree with the Defendants that it is akin to a *draft* finding as it was never reviewed by the Solicitors Office, and never published in the Federal Register, as required under the regulations. *See* 25 C.F.R. §83.10(h) (1994)(within one year after notifying the petitioner that active consideration of the documented petition has begun, the AS-IA *shall* public proposed findings in the Federal)[11]; 83.10(i)(1994) (upon *publication* of the proposed findings, petitioner or any individual or organization wishing to challenge or support the proposed findings shall have right to submit

---

Petitioner 69A's membership had documented descent from historical tribes sufficient to meet the Section 83.7(e) criterion, and if not, how it could make changes to its membership in order to demonstrate that it did meet the criterion.  It is not clear to me, however, in regard to the Section 83.7(b) criterion, that the Defendants misled Petitioner 69A or failed to consider evidence of the Wabbaquasset and some of the other off-reservation families even though they did not expressly identify those families in their discussion.

[11] It does not appear that either the PF or the positive proposed finding issued by AS-IA Anderson was published within one year after active consideration of the petition.  It is not clear if any AS-IA formally extended the period as required by the regulations.

arguments and evidence to AS-IA to rebut or support proposed finding).  Moreover, contrary to

the position taken by the Plaintiff, I do not find that the regulation requires that the AS-IA to

publish in the Federal Register all proposed findings signed by him or her— it simply provides

that to be official and subject to comment and review, a proposed finding *must* be published in

the Federal Register. *Cf. Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199 (2015) (interpretive

rules , which are issued by agency to advise public of agency's construction of statute and rules,

do not require notice and comment obligation that is imposed when issuing legislative rule, and

therefore, do not have force and effect of law and are not accorded that weight in judicial

process).  Moreover, as pointed out by the Defendants, the DOI Office of Inspector General has

issued a report regarding the actions taken by AS-IA Anderson and the DOI during the time

period that the positive proposed finding was signed, which call into question whether the

recommendations made therein were properly analyzed and vetted. Under the circumstances, I

do not find that the Defendants' FD was arbitrary and capricious because it reversed the finding

made in the positive proposed findings.

For the reasons set forth above, I find that Defendants' determination that Plaintiff failed

to satisfy the requisite criterion for federal acknowledgment was not arbitrary or capricious.

Additionally, I do not find that either the procedure utilized by the Defendants, or their decision

denying Plaintiff federal acknowledgment deprived the Plaintiff of its Fifth Amendment right to

due process.  Accordingly, judgment shall enter for the Defendants.[12]

---

[12] Plaintiff asserts a claim for violation of its procedural due process rights in Count Two, and a claim for violation of its right to equal protection under the law in Count Three. However, I agree with the Defendants that Plaintiff has not preserved these claims.  Plaintiff gives lip service to their due process claim (mostly in their Reply Brief); I have given the claim equally succinct treatment.  Plaintiff does not address their equal protection claim at all. Furthermore, the Plaintiff did not provide any argument in support of these alleged claims at the hearing. Under the circumstances, I find these claims forfeited. *See Brown v. Newberger*, 291 F.3d 89, 92-93 (1st Cir. 2002).

**Conclusion**

1. Plaintiff's motion for summary judgment (Docket No. 33), is ***denied***, as provided herein[13]; and

2. Federal Defendants' Motion for Summary Judgment (Docket No. 40) is ***granted***.

**SO ORDERED.**


 **/s/ Timothy S. Hillman**
 **TIMOTHY S. HILLMAN**
 **UNITED STATES DISTRICT JUDGE**

---

[13] This has been a difficult decision because the *existence* of the Nipmuc tribe is indisputable. However, the procedures and criteria for federal acknowledgment adopted by the DOI require the BIA to evaluate the social, political and communal structure of the petitioning tribe. Thus, federal recognition of tribal existence involves much more than simple self-identification; it is a matter of history, ancestry and continuing community. The required criterion are inherently complex and prone to subjective characterizations. Consequently, it is very difficult—some would say almost impossible-- for the petitioning tribe to satisfy all of the criterion. Such is the case here. While reasonable people, including myself, could debate some of the Defendants' findings and characterizations, The Defendants' FD against federal acknowledgement cannot be said to be arbitrary or capricious and therefore, must be upheld.